Lawrence W. BAGGETT et al., Plaintiffs,

v.

Dorothy BULLITT et al., Defendants.
No. 5598.

United States District Court
W. D. Washington, N. D.
Feb. 9, 1963.

Kenneth A. MacDonald, Byron D. Coney, Arval A. Morris, Seattle, Wash., for plaintiffs.

John J. O'Connell, Atty. Gen., Olympia, Wash., Herbert H. Fuller, Deputy Atty. Gen., Ernest M. Furnia, Asst. Atty. Gen., Seattle, Wash., for defendants.

Before JERTBERG, Circuit Judge, and LINDBERG and BEEKS, District Judges.

442

LINDBERG, District Judge.

This is a class action in which sixty plaintiffs employed at the University of Washington in both teaching and non-teaching positions seek declaratory and injunctive relief against the enforcement of two Washington statutes by defendants, the President of the University, the members of the Board of Regents, and the Attorney General of the State of Washington. The statutes under attack are Chapter 377, Laws of 1955, amending the Subversive Activities Act of Washington, Chapter 254, Laws of 1951, herein sometimes referred to as the "loyalty oath" statute; and Chapter 103, Laws of 1931, herein sometimes referred to as the "oath of allegiance" statute.

It is alleged that, as applied to plaintiffs, these statutes are violative of Article 1, Section 10 and the First, Fifth, and Fourteenth Amendments of the Constitution of the United States. The court is asked to declare these statutes unconstitutional and to issue a permanent injunction against their enforcement.

Upon the filing of the complaint a three-judge district court was convened pursuant to the mandate of 28 U.S.C. §§ 2281 and 2284, and on July 13, 1962 heard arguments on plaintiffs' motion for an interlocutory injunction and defendants' motion to dismiss. The motion to dismiss was denied and a temporary injunction was issued pending a full hearing on the merits.

Pretrial conferences were held and an extensive pretrial order, approved by all parties, has been entered, containing a number of stipulations of fact relating to the events, the background, and academic setting of the controversy. Pursuant to stipulation by the parties no oral testimony was presented but statements of several persons were set forth in the pretrial order and a number of exhibits were admitted without objection. The issues of law have been carefully and extensively briefed and orally argued by counsel. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 (3), and 42 U.S.C. § 1983, relating to alleged deprivation of civil rights under color of state law.

BACKGROUND OF THE CASE

Both of the Washington statutes involved require the taking of an oath by employees of the State of Washington. Although the oath of allegiance is required of teachers only, the 1955 statute, which is an amendment to the Subversive Activities Act,[1] provides that every employee of the State of Washington must state under oath whether or not he or she is a member of the Communist party or other subversive organization, and that refusal to answer on any ground shall be cause for immediate termination of such employee's employment or refusal to accept his or her application for employment. The terms "subversive person", "subversive organization" and "foreign subversive organization" as used in the Act are defined therein and the Communist party is declared to be a subversive organization.

While the oath of allegiance statute has not previously been attacked the loyalty oath statute has been the subject of prior litigation[2] commenced in the Superior Court of the State of Washington by Howard Nostrand and Max Savelle, tenured professors at the University of Washington, who are also plaintiffs in the instant case. The Supreme Court of Washington upheld the constitutionality of Chapter 377, Laws of 1955 against attack under both state and federal constitutions, with the exception of one section not here relevant, which secton was declared to be unconstitutional but severable. On appeal to the United States Supreme Court that court vacated the decision of the Su-

---

1. Chapter 9.81, Revised Code of Washington.

2. Nostrand v. Balmer, 53 Wash.2d 460, 335 P.2d 10; Nostrand v. Little, 362 U.S. 474, 80 S.Ct. 840, 4 L.Ed.2d 892; Nostrand v. Little, 58 Wash.2d 111, 361 P. 2d 551; Nostrand v. Little, 368 U.S. 436, 82 S.Ct. 464, 7 L.Ed.2d 426.

preme Court of Washington and remanded the case for a determination whether state employees who refused to sign the oath would be entitled to a hearing at which the refusal to sign the oath could be explained or defended. On the remand the Washington court held that the statutes requiring the loyalty oath did not afford such a hearing but that professors Nostrand and Savelle, as tenured professors, would be entitled to such a hearing pursuant to the terms of their employment contract and under the rules promulgated by the Board of Regents in accordance with their statutory authority. An appeal was again taken to the United States Supreme Court which, in a *per curiam* decision handed down January 22, 1962, granted the Attorney General's motion to dismiss "for want of a substantial federal question." Whereupon the injunction staying enforcement of the loyalty oath statute, which had been in effect since 1955, was dissolved.

Thereafter, in a memorandum issued on May 28, 1962, by President Odegaard pursuant to directions from the Board of Regents, notice was given to all University employees that they would be required to sign an oath which would fulfill the requirements of the Washington Subversive Activities Act, and October 1, 1962 was set as the final date for execution of such oath. Printed forms of an oath in the following language, which differs from that involved in the prior litigation, have been distributed to employees of the University:

"I certify that I have read the provisions of RCW 9.81.010(2), (3), and (5); RCW 9.81.060; RCW 9.81.070; and RCW 9.81.083 which are printed on the reverse hereof; that I understand and am familiar with the contents thereof; that I am not a subversive person as therein defined; and

"I do solemnly swear (or affirm) that I am not a member of the Communist party or knowingly of any other subversive organization.

"I understand that this statement and oath are made subject to the penalties of perjury." (Exhibit # 2)

The sections of the statute referred to in the oath are printed on the reverse side of the oath form as set forth in the footnotes.[3]

---

3. *Subversive Person Ineligible for Public Employment.*

"No subversive person, as defined in this act, shall be eligible for employment in, or appointment to any office, or any position of trust or profit in the government, or in the administration of the business, of this state, or of any county, municipality, or other political subdivision of this state." (RCW 9.81.060) *Definition of Subversive Person, Subversive Organization, and Foreign Subversive Organization.*

"(5) 'Subversive person' means any person who commits, attempts to commit, or aids in the commission, or advocates, abets, advises or teaches by any means any person to commit, attempt to commit, or aid in the commission of any act intended to overthrow, destroy or alter, or to assist in the overthrow, destruction or alteration of, the constitutional form of the government of the United States, or of the state of Washington, or any political subdivision of either of them by revolution, force, or violence; or who with knowledge that the organization is an organization as described in subsections (2) and (3) hereof, becomes or remains a member of a subversive organization or a foreign subversive organization." (RCW 9.81.010(5))

"(2) 'Subversive organization' means any organization which engages in or advocates, abets, advises, or teaches, or a purpose of which is to engage in or advocate, abet, advise, or teach activities intended to overthrow, destroy or alter, or to assist in the overthrow, destruction or alteration of, the constitutional form of the government of the United States, or of the state of Washington, or of any political subdivision of either of them, by revolution, force or violence." (RCW 9.81.010(2))

"(3) 'Foreign subversive organization' means any organization directed, dominated or controlled directly or indirectly by a foreign government which engages in or advocates, abets, advises, or teaches, or a purpose of which is to engage in or to advocate, abet, advise, or teach, activities intended to overthrow, destroy or alter, or to assist in the overthrow, destruction or alteration of the constitutional form of the government of the United

The oath of allegiance for teachers is prescribed by Section 1 of Chapter 103, Laws of 1931[4] and Section 2 of said Chapter,[5] states that every professor, instructor or teacher employed by any state institution of higher learning or any school supported in whole or in part by public funds shall subscribe to the oath or affirmation required of all public school teachers before entering upon the discharge of his duties.

■ The President and Board of Regents of the University of Washington have given notice to all teaching personnel that they are required to subscribe to the oath of allegiance in addition to the loyalty oath. It is not disputed that defendants intend to exact compliance with the provisions of both oath statutes; that they have taken administrative steps to effect such compliance; and have given notice to all members of the University staff that in the event of failure of an employee to comply by subscribing to the oath or oaths required of him by October 1, 1962, "employment will be terminated 30 days later as of October 31, 1962, unless a delay in taking action to terminate seems reasonable because of causes other than intentional refusal to sign."[6] Nor is it disputed that all plaintiffs have refused to sign the oaths required of them, alleging that the statutes are violative of their rights under the United States Constitution. We therefore find that a justiciable controversy exists as to which this court has jurisdiction. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939.

Most of the plaintiffs, including three tenured professors who are aliens, are members of the teaching faculty and are required by the Washington statutes to subscribe to both the loyalty oath and the oath of allegiance. Non-teaching employees are required to sign only the loyalty oath. Some of the plaintiffs are research associates of various ranks— one is a micrometeorologist, another is an assistant editor of the University of Washington Press, two are employed as secretary-typists, and another is a detailer in the cyclotron department. All plaintiffs are suing both for themselves and for others similarly situated.

## CONTENTIONS

The basic claims of plaintiffs are as follows:

1. That the statutory requirements of oath-taking as a condition of employment by the state are unjustifiable invasions of rights of freedom of speech, belief, and association, and freedom of religion, all as protected by the First and Fourteenth Amendments to the Constitution of the United States.

2. That the oath requirements operate as a prior restraint upon free speech and free association and are destructive of academic liberty.

States, or of the state of Washington, or of any political subdivision of either of them, and to establish in place thereof any form of government the direction and control of which is to be vested in, or exercised by or under, the domination or control of any foreign government, organization, or individual." (RCW 9.81.010 (3))
*Communist Party Declared to be Subversive Organization.*
"The communist party is a subversive organization within the purview of chapter 9.81 and membership in the communist party is a subversive activity thereunder." (RCW 9.81.083)
*Oath Required of Employees of State of Washington.*
" * * * Every such person, board, commission, council, department, court, or other agency shall require every employee or applicant for employment to state under oath whether or not he or she is a member of the communist party or other subversive organization, and refusal to answer on any grounds shall be cause for immediate termination of such employee's employment or for refusal to accept his or her application for employment." (RCW 9.81.070)

4. RCW 28.70.150.

5. RCW 28.76.230.

6. Memorandum to All Members of University Staff, distributed by the office of the President on 28th day of May, 1962; Pretrial Order, pages 85–87.

3. That the language of the oaths is vague and uncertain.

4. That the statutes violate the Fifth Amendment privilege against self-incrimination; and that the requirement of a positive act of oath-taking on pain of loss of employment, unconstitutionally shifts the burden of proof on the question whether they are subversive persons.

5. That the statutes and administrative action contemplated thereunder provide for summary and automatic discharge on grounds unrelated to fitness for employment and would deprive non-tenured employees of reputation and property rights without the protections of procedural due process, and are therefore an arbitrary and discriminatory exercise of state power.

6. That the 1955 loyalty oath statute is a bill of attainder.

7. Invoking the supremacy clause, plaintiffs argue that these statutes deal with sedition, a subject preempted by the Congress, under the holding of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640. Plaintiffs further claim that the oath of allegiance statute interferes with the conduct of foreign relations in that it sets a condition for employment as a teacher in the state university which, in effect, excludes foreign scholars from teaching at the university.

Other arguments are addressed to the wisdom of the legislation and will not be discussed.

Defendants, on the other hand, contend that it is within the power of the State of Washington to require a loyalty oath as a condition of employment by the state for the purpose of safeguarding the state from disloyalty; and to prescribe the taking of an oath of allegiance as a qualification for fitness to teach. They deny that the oath requirements invade any constitutionally-protected rights of plaintiffs, deny that the oaths are vague and uncertain, and argue that it is not apparent in the present context of events that any employee will be denied procedural due process in any future proceeding for termination of employment for failure to subscribe to the required oath or oaths.

## DISCUSSION

We wish to emphasize at the outset that this is a declaratory judgment action. Enforcement of the statutes by University officials, while clearly intended, is still prospective as a result of this litigation. The court granted a temporary restraining order on June 25, 1962. With the acquiescence of the defendants the restraining order was continued as a temporary injunction pending trial and is still in effect, pending the decision of the court. Consequently, although the date of October 1, 1962, set as the deadline date for University employees to subscribe to the oath, has come and gone, none of the plaintiffs has been dismissed for refusal to sign the oath or oaths. Thus the dismissal policies and hearing procedures which would actually be put into effect by the University administration are not known, which causes the "due process" issues to be speculative and difficult of resolution. The principal questions, however, must necessarily relate to the validity of the statutes as construed on their face and in the light of surrounding circumstances, and to these issues we direct our primary attention.

Plaintiffs have elected to treat the two oath statutes together in large part. In view of the conclusions we have reached we shall consider the statutes separately. All of the contentions of the parties which merit consideration will be treated in the course of discussion of the issues raised as to each statute.

### The Loyalty Oath Statute

In considering the provisions of the 1955 amendment to the 1951 Subversive Activities Act, which form the basis for the loyalty oath requirement, we are not concerned with the effectiveness or the wisdom of loyalty oaths. We perceive the truth of the remark of Justice Black, concurring in Speiser v. Randall, 357

U.S. 513, 532, 78 S.Ct. 1332, 2 L.Ed.2d 1460:

> "I am certain that loyalty to the United States can never be secured by the endless proliferation of 'loyalty' oaths; loyalty must arise spontaneously from the hearts of people who love their country and respect their government."

But questions of wisdom and effectiveness are matters of legislative and not judicial concern.

■ Was the legislation within the power of the Washington legislative body to enact? It cannot be questioned that a state has power to safeguard the public service from disloyalty;[7] and the right of the state to inquire of its employees concerning their loyalty has been recognized in a number of cases.[8] A statute enacted for such a purpose "comes to us encased in the armor wrought by prior legislative deliberation,"[9] and we are mindful of "the deference due to legislative determination of the need for restriction upon particular forms of conduct."[10]

The 1951 statute was enacted by the legislature pursuant to executive request following a report of a joint fact-finding committee of the Washington legislature investigating un-American activities in the State of Washington.[11] It must be presumed that legislative findings sufficient to justify the enactment of the 1951 statute were made, and that the 1955 amendment was supported by the same findings. We are therefore unable to accept plaintiffs' argument that there has been no showing of a public danger sufficient to justify the enactment of restrictive legislation.

■ The loyalty oath is required of every state employee or applicant for state employment. But plaintiffs argue vehemently that loyalty oaths may not be required of academic personnel of a university; that such a condition is "utterly inconsistent" with the necessities of their role in the academic community as discoverers and transmitters of knowledge and truth; in effect, that they stand in a category apart. We cannot agree that members of state institutions of higher learning are constitutionally immune from inquiry into matters within the legitimate legislative concern, in the public interest.[12]

The next question is whether there is a rational relationship between the condition imposed by the statute and the particular public service rendered by those plaintiffs whose duties are of an academic nature. The essentiality of the preservation of universities as centers of thought, research and teaching can never be doubted. Nor can we overemphasize the absolute necessity of academic freedom as a vital force, both in the effective functioning of these great educational institutions and in the maintenance of our democratic society.[13] Teaching and research personnel must do their work in an atmosphere of free inquiry, free of external restraints on thought, and equally free of secret restraints on their individual intellects. Academic freedom of inquiry and the fearless pursuit of truth and knowledge, wherever they may lead, is not possible

---

7. Cramp v. Board of Public Instruction, 368 U.S. 278, 288, 82 S.Ct. 275, 7 L.Ed. 2d 285; Uphaus v. Wyman, 360 U.S. 72, 76–77, 79 S.Ct. 1040, 3 L.Ed.2d 1090.

8. Gerende v. Board of Supervisors, 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745; Garner v. Board of Public Works, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317; Beilan v. Board of Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414; Lerner v. Casey, 357 U.S. 468, 78 S.Ct. 1311, 2 L.Ed.2d 1423; Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517.

9. Bridges v. California, 314 U.S. 252, 261, 62 S.Ct. 190, 86 L.Ed. 192.

10. American Communications Ass'n v. Douds, 339 U.S. 382, 401, 70 S.Ct. 674, 94 L.Ed. 925.

11. Nostrand v. Balmer, 53 Wash.2d 460, 465, 335 P.2d 10.

12. See Barenblatt v. United States, 360 U.S. 109, 112, 79 S.Ct. 1081, 3 L.Ed.2d 1115.

13. See Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311.

for an individual who is fettered by dedicated membership in an association whose purpose is violent overthrow or destruction of our constitutional form of government, the very guardian of our rights and freedoms. Such an individual is incapable of fearless and untrammelled inquiry and creative thought because he is bound by a rigid adherence to an ideology governed by the political expediencies of its revoluntary purpose rather than by dedication to the verities wherever they may be discovered. Academic personnel should be unfettered by the restraints on free thought which such an association imposes if they are to effectively perform their duties in the academic world. Education, not indoctrination, is the function of a university teacher.

The legislative declaration that one who is under the discipline of membership in a subversive organization, as defined in the statute, is unfit for a position of trust in the public service [14] is supported by reason and experience, and is most poignantly applicable to positions of trust in a state university, where an absence of both institutional and associational restraint on free thought and inquiry is of the essence of effective service. It is unnecessary to dwell at length on the influence exerted by university teachers in the molding and development of young minds. It is well recognized that inquiry into the moral and intellectual fitness of a teacher is relevant to the question of his fitness to teach.[15] We cannot say that application of the loyalty oath provisions to academic personnel of a state university is without rational relationship to the purposes of the entire legislative enactment, which

was within the power of the State of Washington to enact.

May the desired information be elicited by use of a form of disclaimer oath as a substitute for individual inquiry of each employee? We think it may, if the oath is sufficiently limited [16] to the area of legitimate state concern. In an institution as large as the University of Washington, to conduct personal interviews of all present and prospective employees concerning their loyalty would be administratively burdensome and might be subject to abuses. In lieu of such inquiry the university officials have elected to require a sworn statement, narrowly limited to the precise matters of legitimate state concern. So limited, the oath serves the same purpose as individual inquiry.

But plaintiffs assert that the requirement that they sign the form of oath presented to them, in the language in which it is couched, unjustifiably invades their First Amendment freedoms of speech, belief and association, and will tend to discourage the exercise of constitutionally-protected rights of association and exchange of ideas, incidentally impairing their performance of their academic function. Such rights, whether in relation to academic liberty or otherwise, are to be accorded a high degree of constitutional protection, but they are not "absolutes." It is sometimes necessary to reconcile these constitutional protections against the exercise of valid governmental powers by a "balancing" of the interests involved.[17] Recent cases have made clear that a substantial invasion of such rights may not be justified by reliance on a state's right to inquire into the fitness and competency of teachers.[18] But we find no such

14. RCW 9.81.060.

15. Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231; Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517.

16. See Gerende v. Board of Supervisors, 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745; Garner v. Board of Public Works, 341 U. S. 716, 71 S.Ct. 909, 95 L.Ed. 1317.

17. Konigsberg v. State Bar, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105.

18. Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285; Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231.

invasion of constitutional rights by the statute and oath in question here. A careful consideration of the language of the oath confirms the impression left by a cursory reading; namely, that the oath does not require any statement as to the political, religious, economic or social beliefs of the person subscribing thereto, nor does it require him to refrain from membership in any kind of association whatever, *except* those associations which have an aim or purpose to overthrow, destroy or alter the constitution and government of the state or nation by revolution, force or violence.

The employee is not asked to reveal all his associational ties, past and present, as in Shelton v. Tucker; [19] nor is he asked, as in Cramp v. Board of Public Instruction,[20] to swear that he has not "in the unending past ever knowingly lent (his) 'aid' or 'support', or 'advice' or 'counsel' or 'influence' to the Communist party;" nor is he asked, as in Sweezy v. New Hampshire,[21] to make statements about matters of private conscience which are not clearly included within the scope of legislative concern. Plaintiffs' reliance on these cases is misplaced. In all three the requirement on which employment was conditioned is distinguishable from the condition here imposed. Plaintiffs here are simply required to state that they do not now and will not in the future engage in the proscribed subversive conduct nor become or remain a member of a subversive organization as defined in the statute. The Washington statute is not concerned with past membership, and the Washington court has held that the element of scienter is implied in every clause of the pertinent statutory provisions.[22] If denial of state employment to a "subversive" person, as defined in the statute, constitutes any invasion of constitutional rights of speech and association, the restriction certainly goes no further than may be justified, under "balancing" principles, by the state's interest in self preservation and in the qualifications and fitness of its employees.[23]

 Plaintiffs further assert that the loyalty oath requirement operates as a prior restraint upon free speech and association and is destructive of academic liberty. This contention is bound up with the further argument that the structure and language of the oath is vague, leaving plaintiffs uncertain of the sweep of the statute and the kind of conduct or association which will disqualify an individual from public employment. Plaintiffs, relying on Cramp, supra, voice apprehension that at some future time, as a result of alleged vagueness, conduct and association which is nonconforming or which finds disfavor in the prevailing community sentiment, will be found to be "subversive" under the terms of the statute. It is our view that a reasonable construction of the statutory language does not leave the meaning uncertain or vague—in any event not to the extent that the statute must or should be held unconstitutional in an action such as this. The words used are to be understood in accordance with the ordinary meaning of the words in current usage.

Plaintiffs have singled out the words "abet", "assist", and "by any means" for criticism on the score of vagueness. According to Webster's New International Dictionary, 2nd edition, the ordinary meaning of those words in current usage is:

> "abet * * * To incite, encourage, instigate, or countenance;—now used chiefly in a bad or a disparaging sense; as, to abet the commission of a crime."

19. 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231.

20. 368 U.S. 278, 286, 82 S.Ct. 275, 7 L.Ed. 2d 285.

21. 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311.

22. Nostrand v. Balmer, 53 Wash.2d 460, 484, 335 P.2d 10.

23. See Uphaus v. Wyman, 360 U.S. 72, 80, 79 S.Ct. 1040, 3 L.Ed.2d 1090.

"assist * * * To lend aid; to help."

"by any means * * * In any way; possibly; at all."

■ With these definitions in mind the meaning of "abet", "assist" and "by any means", as used in the statute, is free of ambiguity. It is not unreasonable to ask an employee to state that he "understands and is familiar with" the contents of the statutory provisions printed on the reverse side of the form. It is only necessary that he understand the concepts reasonably and ordinarily conveyed by the language. He is not required to speculate concerning the applicability of every conceivable or rare meaning of the words employed.

■ Plaintiffs also seize upon the words "alter" and "revolution" and argue that their inclusion in the statute must mean that public employees may not engage in conduct or association which seeks, by peaceful and lawful means, to effect a radical change in the governmental structure. To find such a legislative intent in the statute would be unreasonable in view of the provisions in both state and federal constitutions for amendments to our constitutional form of government. It is not difficult to ascribe a strained interpretation to a statute if one is dissecting it with a view to the establishment of its invalidity, but sound principles of statutory construction require that the provisions of a statute be interpreted in a manner consistent with the intent and purpose of the entire enactment and the usual meaning of the language in the context in which it is employed. In context, it is clear that "revolution" as used does not refer to a peaceful change of a revolutionary nature. It is to be construed along with the accompanying words "by * * * force or violence" and refers to forceful or violent revolution,[24] which has been the usual historical meaning of the word "revolution" when used in a political context. As so construed, the inclusion of the word "revolution" is admittedly redundant, but the fact of such redundancy will not sustain an argument that the legislature intended by the mere insertion of that word to fundamentally enlarge and change the whole scope and intent of the enactment in disregard of the established concepts of constitutional amendment or change by peaceful and lawful means. To state such an interpretation is to reveal its absurdity.

■ Similarly, the words "force or violence" as used in the statute clearly modify and relate back to the antecedent verb and noun, "alter" and "alteration," just as they modify the other verbs and nouns in the series of which they are a part; viz.:

"any act intended to overthrow, destroy or alter, or to assist in the overthrow, destruction, or alteration of * * * the constitutional form of the government * * * by * * * force or violence."

■ It has not been shown that upon subscribing to the "disclaimer" oath plaintiffs will thereby experience any stifling of their freedom of inquiry, criticism and dissent, nor that their academic freedom will be impaired. Without questioning the sincerity of plaintiffs' fears that public hysteria or the temper of the times might conceivably at some future time bring about such a result we are unable in this declaratory judgment action to find any substantiation for such fears, on the face of the statute or in the facts of record or within judicial knowledge. It is our conclusion that Chapter 377, Laws of Washington, 1955, does not constitute a prior restraint on First Amendment freedoms;

24. See Shub v. Simpson, 196 Md. 177, 76 A.2d 332, certiorari denied 340 U.S. 861, 71 S.Ct. 91, 95 L.Ed. 629, in which the Maryland court so construed a statute couched in terms substantially similar to those employed in Chapter 377, Laws of Washington, 1955; and Gerende v. Board of Supervisors, 341 U.S. 56, 71 S. Ct. 565, 95 L.Ed. 745, in which the United States Supreme Court affirmed *per curiam* a Maryland decision based on the interpretation of the statute as given in Shub.

nor are we constrained to find its language to be vague and uncertain.

As to alleged prior restraints, it is unnecessary to discuss the arguments based upon plaintiffs' interpretation of the cases of Scales v. United States [25] and Noto v. United States [26] because such arguments (to the effect that a state may not prohibit an inactive knowing membership in a subversive organization and therefore may not condition public employment on an employee's undertaking to refrain from such an association) assume the premise that a state may not disqualify an individual for public employment on the ground that he engages in certain conduct or association when such conduct or association is not criminally punishable. The premise is unsound. Unreliability,[27] or insubordination,[28] or lack of frankness and candor in answering inquiries [29] may render an individual ineligible for employment without necessarily exposing him to criminal prosecution. Different standards are applicable and Smith Act cases are not in point.

■ A further argument made against the validity of the loyalty oath statute is that it infringes upon the privilege against self-incrimination. There is no merit in this argument. The statutory requirement that government employees must answer relevant questions by written statement if they wish to establish their eligibility for employment does not require plaintiffs to give testimony against themselves. The absence of any inquiry into past conduct and the implied inclusion of the element of scienter negate the potential danger of self-incrimination. The statements in

Cramp, supra, on which plaintiffs rely, were made in reference to an oath in language found to be unconstitutionally vague and are not applicable here.

■ Relying primarily on Speiser v. Randall,[30] plaintiffs further argue that the loyalty oath requirement is an unconstitutional shifting of the burden of proof in regard to the loyalty of a government employee. However, in Konigsberg v. State Bar Association,[31] the United States Supreme Court pointed out that there is a distinction between statutes penalizing or controlling free speech—like the statute found unconstitutional in Speiser—and those statutes "merely denying access to positions where unfitness may lead to abuse of state-given powers or privileges." [32] In Speiser, the court distinguished such cases as Garner v. Board of Public Works, 341 U.S. 716, 71 S.Ct. 909, 95 L. Ed. 1317, Gerende v. Board of Supervisors, 341 U.S. 56, 71 S.Ct. 565, 95 L. Ed. 745, and American Communications Assn. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925, in that the purpose of the statutes there involved was to protect "some interest clearly within the sphere of governmental concern" from an evil "sufficiently grave to justify limited infringement of political rights." [33] We think the statute here involved, insofar as it affects these plaintiffs, is similarly distinguishable. Speiser is therefore not controlling.

■ The pre-emption argument based on Pennsylvania v. Nelson,[34] need not detain us long, on these facts. The court's opinion in Uphaus v. Wyman,[35] indicates that Nelson did not strip the states of the right to guard their own

25. 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed. 2d 782.

26. 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed. 2d 836.

27. Lerner v. Casey, 357 U.S. 468, 78 S.Ct. 1311, 2 L.Ed.2d 1423.

28. Nelson v. Los Angeles County, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494.

29. Beilan v. Board of Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414.

30. 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460.

31. 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105.

32. Id. at page 56, 81 S.Ct. at page 1007.

33. Speiser v. Randall, 357 U.S. 513, 527, 78 S.Ct. 1332, 2 L.Ed.2d 1460.

34. 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640.

35. 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090.

security and a state may legitimately make inquiry and investigate in this area.

The contention that the loyalty oath statute is a bill of attainder was argued and disposed of in the course of the prior litigation and merits no discussion here. See also Garner v. Board of Public Works, supra, 341 U.S. at page 722, 71 S.Ct. at 913, 95 L.Ed. 1317.

As in the prior litigation arising out of this statute, the question whether or not an employee who refuses to subscribe to the loyalty oath will be afforded a hearing prior to discharge presents a substantial issue of due process. The Supreme Court of the State of Washington has held in Nostrand v. Little [36] that professors with tenure are entitled to a hearing under the terms of their employment contract and the rules and regulations under which the University of Washington is operated. The rights of state employees other than tenured professors were not before the Washington court in Nostrand and the court did not feel obliged to reach the question of the hearing rights of employees other than the plaintiffs there.[37] Whether or not the non-tenured employees of the University—some of whom are plaintiffs here —have a right to a hearing under any statutory provisions is unclear. Defendants have argued that such employees may be entitled to a hearing under the provisions of the Administrative Procedure Act [38] or under the State Civil Service Law.[39] Plaintiffs, on the other hand, have argued that neither the Administrative Procedure Act, as construed in Nostrand v. Little, supra, nor the civil service statute are applicable to employees of the University, which is operated under rules and regulations adopted by the Board of Regents pursuant to statutory authority.[40]

Plaintiffs interpret the statutory language: "refusal to answer on any grounds shall be cause for immediate termination of * * * employment" [41] to mean that upon the refusal of an employee to sign the oath, for no matter what reasons, discharge will follow automatically and immediately without any opportunity for the employee to explain or defend his refusal to sign. Plaintiffs' reading of the directive issued from the office of the President of the University requiring compliance with the statutory oath provisions leads plaintiffs to the conclusion that university officials similarly interpret the statute as requiring *automatic* and summary discharge for every refusal to sign regardless of the basis of the refusal. The statutory language does not compel such a conclusion and we are not persuaded that it is so interpreted by the University administration, nor that the statute will be so administered by them. The fact that refusal on any ground is declared to be "cause" for immediate termination of employment does not close the door to hearing and inquiry; nor does it preclude the exercise of administrative discretion if it should appear that the refusal to sign the oath is in no way related to a wilful refusal to make disclosure as to whether or not the employee is a member of a subversive organization.

In connection with the "automatic discharge" issue, defendants have cited the case of Nelson v. Los Angeles County,[42] which involved discharges of two county employees—one permanent, one temporary—after they refused to answer inquiries of an investigating committee relating to subversive activities. The case is not helpful inasmuch as the employees in Nelson were discharged for "insubordination." Furthermore, affirmance of the discharge of the per-

36. 58 Wash.2d 111, 361 P.2d 551.

37. Nostrand v. Little, 58 Wash.2d 111, footnote 6 at page 133, 361 P.2d 551.

38. Chapter 234, Laws of Washington 1959; RCW 34.04.010 et seq.

39. Chapter 1, Laws of Washington 1961; Chapter 41.06, RCW.

40. RCW 28.77.120 and RCW 28.77.130.

41. RCW 9.81.070.

42. 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494.

manent employee was by an equally divided court which renders the case of little value as a precedent.[43]

Plaintiffs, in turn, rely on Slochower v. Board of Education,[44] in which a statute providing for discharge of city employees who invoke the Fifth Amendment was held to be arbitrary and unreasonable because based on a "built-in" inference of guilt from the invoking of the constitutional privilege.

Although discharge of a state employee for failing to fulfill a condition of employment by signing the loyalty oath carries no necessary inference of disloyalty of the employee, it would be ostrich-like to ignore the practical realities of a public opinion which tends to attach a stigma of disloyalty to such a discharge, a stigma which may have a profound effect on the discharged employee's future employment and social and economic status. The severe impact of such a discharge upon an employee whose refusal may be motivated by considerations unrelated to disloyalty, invokes the protection of due process with compelling force.

The United States Supreme Court, in referring to language used in Adler v. Board of Education[45] and United Public Workers v. Mitchell,[46] has said, through Justice Clark:

"To draw from this language the facile generalization that there is no constitutionally protected right to public employment is to obscure the issue. * * * We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory."

This principle expressed in Wieman v. Updegraff[47] was recently reaffirmed in Cramp v. Board of Public Instruction.[48]

It has not been urged here by defendants that plaintiffs are not entitled to such constitutional protection. On the contrary, defendants in their brief have urged this court not to assume that nontenured employees are not entitled to a hearing under some aspect of Washington law. As was pointed out earlier in this opinion, in this declaratory judgment proceeding the dismissal policies and hearing procedures which would actually be put into effect by the University administration under the statute and/or under its own rules and regulations are a matter for speculation. On the showing here made this court will not presume that the defendant state officials will act arbitrarily or in disregard of constitutional rights of public employees, but this court must assume that the statute will be administered and applied in a constitutional manner.[49]

Finding no invalidity of Chapter 377, Laws of 1955, either on its face or in the light of the facts of record, we pass on to a consideration of the oath of allegiance provisions of Chapter 103, Laws of 1931.

*The Oath of Allegiance Statute*

In the codification of Chapter 103, Laws of 1931 (RCW 28.70.150 and RCW 28.76.230), certain changes have been made in the language of some sections thereof. For this reason the entire chapter is set out in the footnotes for reference.[50] The statutorily-prescribed lan-

43. United States v. Pink, 315 U.S. 203, 216, 62 S.Ct. 552, 86 L.Ed. 796; Hertz v. Woodman, 218 U.S. 205, 213–214, 30 S.Ct. 621, 54 L.Ed. 1001.

44. 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692.

45. 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517.

46. 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754.

47. 344 U.S. 183, 191–192, 73 S.Ct. 215, 97 L.Ed. 216.

48. 368 U.S. 278, 288, 82 S.Ct. 275, 7 L. Ed.2d 285.

49. Cf. Shuttlesworth v. Birmingham Board of Education, D.C., 162 F.Supp. 372, 384; affirmed *per curiam* 358 U.S. 101, 79 S. Ct. 221, 3 L.Ed.2d 145.

50. Chapter 103, Laws of Washington, 1931: "Section 1. That every person apply-

guage of the oath of allegiance is found in Section 1 of Chapter 103, which reads:

"That every person applying for a license to teach or renewing an existing contract, in the State of Washington, shall take and subscribe to the following oath or affirmation:

" 'I solemnly swear (or affirm) that I will support the constitution and laws of the United States of America and of the State of Washington, and will by precept and example promote respect for the flag and the institutions of the United States of America and the State of Washington, reverence for law and order and undivided allegiance to the government of the United States.'

"No license to teach in the State of Washington shall be issued, or contract, or renewal thereof, signed by any school board, unless it shall affirmatively appear on said license or in said contract, or renewal thereof that such teacher has taken, subscribed and filed therewith the foregoing oath or affirmation."

In view of the mandatory language of the statute there can be little doubt that dismissal or ineligibility must necessarily and automatically result from refusal of a teacher to sign this oath.

Insofar as the arguments heretofore considered with respect to the loyalty oath are advanced also in connection with the attack on the validity of the oath of allegiance statute, the preceding discussion of the points raised is applicable. Additional arguments particularly addressed to the oath of allegiance relate to alleged vagueness of the language employed in the statutory form of oath; alleged infringement of religious liberty; and alleged interference with foreign relations, by, in effect, excluding foreign scholars from teaching positions at the University of Washington.

ing for a license to teach or renewing an existing contract, in the State of Washington, shall take and subscribe to the following oath or affirmation:

" 'I solemnly swear (or affirm) that I will support the constitution and laws of the United States of America and of the State of Washington, and will by precept and example promote respect for the flag and the institutions of the United States of America and the State of Washington, reverence for law and order and undivided allegiance to the government of the United States.'

"No license to teach in the State of Washington shall be issued, or contract, or renewal thereof, signed by any school board, unless it shall affirmatively appear on said license or in said contract, or renewal thereof that such teacher has taken, subscribed and filed therewith the foregoing oath or affirmation.

"Sec. 2. Every professor, instructor or teacher, who shall be employed hereafter or whose contract may be renewed by any state institution of higher education, or any school supported in whole or in part by public funds, or is entirely or in part exempt from taxation, shall before entering upon the discharge of his or her duties subscribe to the oath or affirmation prescribed in section 1 before a person authorized by law to administer oaths,

and/or affirmations, such oath or affirmation to be executed in duplicate and one copy filed with the head of such institution and the other retained by such deponent.

"Sec. 3. The clerks of school boards are hereby authorized to administer the oath required by this act.

"Sec. 4. It shall be unlawful for any person authorized to issue license to teach or any school board to hereafter issue any new license to teach in the state or execute any contract or renewal thereof with any person or persons who fail or refuse to execute the oath or affirmation herein provided, and any contract executed or renewed or license issued in violation hereof shall be and is hereby declared to be null and void.

"Sec. 5. If any section of this act shall for any reason be held invalid, that such construction shall not affect the other provisions herein contained not expressly invalidated.

"Sec. 6. The oath herein provided shall be required of all teachers whose contracts are renewed or executed from and after March 1, 1931.

"Passed the Senate March 4, 1931.

"Passed the House March 10, 1931.

"Approved by the Governor March 20, 1931."

■ With regard to the latter argument we entertain doubts that the Washington legislature had in contemplation the application of the oath requirement to aliens, or that the enactment consciously expressed any legislative intent to exclude foreign citizens from teaching positions in the State of Washington. In actuality, the oath prescribed by the 1931 statute has not been required of alien members of the teaching faculty at the University of Washington, but they have been permitted to modify the statutory language to reflect a limitation of the undertaking to that which is compatible with citizenship in another sovereign nation. It has been stipulated that it is the intention of the University administration to continue this policy.[51] In practice, foreign scholars are not excluded from teaching at the University of Washington nor is a condition imposed on them which is unreasonably inconsistent with their own national allegiance. On these facts, neither the impact of the 1931 statute on aliens nor any speculative effect of its enforcement on the pre-empted field of foreign relations, are properly before this court. The alien plaintiffs may not challenge the constitutional validity of a statute with respect to an application thereof which has never been enforced.[52]

Plaintiffs raise issues in regard to alleged vagueness of the language of the prescribed oath of allegiance. In particular, they find uncertainty in the meaning and scope of the words, "institutions", "reverence for law and order", and "undivided allegiance to the government * * *." Certain plaintiffs who are Quakers are alarmed by what to them is the import of the phrase "undivided allegiance to the government * * *", which they construe to exclude the possibility of allegiance to God, humanity, individual conscience, or the concept of world government. In plaintiffs' brief it is argued that the statute seeks to establish an official religion of secular nationalism and thereby infringes on religious freedoms guaranteed by the First Amendment to the United States Constitution.

Plaintiffs further state they do not know what positive changes in their subject-matter teaching may be expected of them if they swear to "promote" by "precept" and "example" the qualities enumerated in the statute.

■ These contentions of vagueness of the oath of allegiance statute raise substantial constitutional issues, bringing into question as they do the meaning and intended scope of the statute. Although statutory construction may resolve these questions in such a way as to remove doubts concerning constitutionality, it appears that the Supreme Court of Washington has never had occasion to construe the oath of allegiance provisions of Chapter 103, Laws of 1931, although declaratory judgment proceedings are available in the Washington courts. Authoritative interpretation of the statute by the Washington court may avoid the constitutional issue, or show it in clearer perspective, or resolve it. The following statements from Justice Stone's opinion in Alabama State Federation of Labor v. McAdory[53] seem particularly applicable to the present case:

"In advance of an authoritative construction of a state statute, which the state court alone can make, this Court cannot know whether the state court, when called on to apply the statute to a defined case or controversy, may not construe the statute so as to avoid the constitutional question. For us to decide the constitutional question by anticipating such an authoritative construction of the state statute would be either to decide the question unnecessarily or rest our decision on the unstable foundation of our own construction of the state statute which the state

51. Pretrial Order, page 77.

52. Cf. Poe v. Ullman, 367 U.S. 497, 81 S. Ct. 1752, 6 L.Ed.2d 989.

53. 325 U.S. 450, 470–471, 65 S.Ct. 1384, 89 L.Ed. 1725.

court would not be bound to follow. Spector Motor Co. v. McLaughlin, supra, [323 U.S. at page] 105, [65 S.Ct. at page 154]; see also Vandenbark v. Owens-Illinois Co., 311 U.S. 538, 543, 61 S.Ct. 347, 85 L.Ed. 327; Huddleston v. Dwyer, 322 U.S. 232 [64 S.Ct. 1015, 88 L.Ed. 1246]. Such is not the function of the declaratory judgment

" * * * it is in the public interest to avoid the needless determination of constitutional questions and the needless obstruction to the domestic policy of the states by forestalling state action in construing and applying its own statutes. See Great Lakes [Dredge & Dock] Co. v. Huffman, supra, [319 U.S.] 300, [63 S. Ct. at page 1074, 87 L.Ed. 1407] et seq."

The granting or withholding of equitable or declaratory relief in federal court suits which seek to limit or control state action is committed to the sound discretion of the court.[54] Accordingly, in the absence of a concrete factual showing that any plaintiff or any member of the classes of state employees here represented has suffered actual injury by reason of the application of the oath of allegiance statute (Chapter 103, Laws of 1931) this court will decline to render a declaratory judgment as to the constitutionality of that statute in advance of an authoritative construction by the Washington Supreme Court.

Having found no invalidity of Chapter 377, Laws of 1955, and having declined to consider the constitutionality of Chapter 103, Laws of 1931 in advance of state court interpretation, we deny plaintiffs' request for a permanent injunction against the enforcement of these statutes, and the preliminary injunction now in effect will be dissolved.

54. Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725; Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407; Railroad

Counsel are directed to file with the clerk of the court within ten days from the date of this opinion an order in accordance with the conclusions herein stated.

Comm. v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971; Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L. Ed. 1424.